[Cite as *Kraft v. Kraft*, 2014-Ohio-4852.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

TERESA L. KRAFT              :

      Plaintiff-Appellee/          : C.A. CASE NO.    25982
      Cross-Appellant

v.                             : T.C. NO.    10DR1079

D. MICHAEL KRAFT         :   (Civil appeal from Common
                                  Pleas Court, Domestic Relations)

      Defendant-Appellant/      :
      Cross-Appellee

                                :

                                :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    31st    day of    October   , 2014.

. . . . . . . . . .

BRIAN A. SOMMERS, Atty. Reg. No. 0072821, 130 W. Second Street, Suite 840, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee/Cross-Appellant

THERESA A. BAKER, Atty. Reg. No. 0059122, 120 W. Second Street, Suite 1700, Dayton, Ohio 45402
      Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    Defendant-appellant/cross-appellee D. Michael Kraft (hereinafter "Michael") appeals from a Final Judgment and Decree of Divorce issued by the Montgomery County Court of Common Pleas, Domestic Relations Division, which distributed assets and allocated debt accrued during the course of his marriage to plaintiff-appellee/cross-appellant Teresa L. Kraft (hereinafter "Teresa").  Michael filed a timely notice of appeal with this Court on October 31, 2013.  Teresa originally filed a timely notice of cross-appeal with this Court on November 12, 2013.  However, on November 26, 2013, this Court issued a show cause order regarding why Teresa's cross-appeal should not be dismissed for lack of jurisdiction in light of her failure to file notice of her cross-appeal with the trial court.  Teresa filed a reply to the show cause order on December 10, 2013, wherein she asserted that she had filed notice of her cross-appeal with the trial court on December 9, 2013.  On February 7, 2014, we issued a decision and entry in which we found that our show cause order had been satisfied by Teresa's reply, and we allowed her cross-appeal to proceed.

{¶ 2}    Michael and Teresa were married in Eaton, Ohio, on December 29, 1984.  The parties had no children.  Throughout the course of their marriage, the parties resided together at 8229 Old Dayton Road, Dayton, Ohio, 45417 (hereinafter "the property").  Michael inherited the property in 1981 from his aunt.  The property, which consists of approximately 34.7 acres, is zoned for agricultural use.  The property contains a residential home, two outbuildings, and vacant land.  Michael testified that he farms approximately 33 acres of the vacant land.  Michael's farming business is known "Kraft Farms."   At the time of the trial, Michael was also employed full-time with Perry Township as a road and cemetery superintendent.  The record

establishes that Michael has been employed with Perry Township since May 19, 1985.

{¶ 3} Teresa testified that she assisted Michael with work on the farm in the earlier part of their marriage. Due to various health problems, however, Teresa testified that she has not been able to work full-time since 2000. Teresa testified that she was last employed part-time at a pet grooming business in 2004 but was forced to quit due to back problems. Teresa's health problems include degenerative back disease necessitating three surgeries requiring disk fusion, rod insertion, and bone grafts. Teresa testified that she also suffered from high blood pressure, depression, asthma, allergies, and diabetes. Teresa's last surgery in 2010 required the insertion of approximately ten screws and two braces into her lower back. Teresa testified that she must use a walker to move around because she is unable to lift her right leg. Neither Michael nor Teresa pursued any educational opportunities after graduating from high school.

{¶ 4} On October 7, 2010, Teresa filed a complaint for divorce. Michael filed an answer and counterclaim on October 19, 2010. A trial was held on March 22, 2012, May 21, 2012, April 10, 2013, and April 15, 2013. Both parties were fifty years old when the trial began. At the beginning of the trial, the parties advised the court that they had agreed on several issues and requested to enter the following stipulations into the record:

1. Automobiles. The parties agreed that Michael would retain a 1986 GMC 3500 truck worth $3,500.00. Teresa would retain 2000 GMC Jimmy SUV worth $4,400.00. Teresa agreed to pay Michael the sum of $450.00 to equalize the disparity in the value of the vehicles.

2. Retirement. The parties agreed that Teresa was entitled to one-half of the marital portion of Michael's Ohio Public Employees Retirement System

(OPERS) account through his employer, Perry Township, Ohio, from the date of marriage to the date of the filing of the complaint for divorce. It was also agreed that Teresa was entitled to cost of living adjustments, survivorship benefits, and all other benefits available to Michael on a pro rata basis.

3. Farm Equipment. The parties agreed to the value of several pieces of farming equipment owned solely by Michael's business, Kraft Farms. The total fair market value of the equipment was found to be $40,888.00, and Teresa was entitled to $20,444.00.

4. 2010 Farm Debt and Crop Proceeds. The parties agreed that Teresa was entitled to the sum of $24,513.50 from the sale of the 2010 crop proceeds from Kraft Farms.

5. Tools, Household Goods, and Furnishings. The parties agreed to the division of the miscellaneous tools, household goods, and furnishings. In order to equalize the values of the property each party retained, Michael agreed to pay Teresa $2,417.00.

6. Credit Card Debt. At the time that the divorce complaint was filed, Teresa owed $8,139.45 to GM, HSBC, American Express, Springfield Financial, and two accounts with Wells Fargo Bank. Accordingly, Michael agreed to pay Teresa $4,070.00 in satisfaction of his portion of the outstanding credit card debt.

7. Kraft Farms. The parties agreed that Michael would retain sole ownership of the farm business known as Kraft Farms free of any claim of Teresa.

8. Separate Bank Accounts. The parties agreed that any separate bank

accounts would be the sole property of the party in whose name the account existed.

{¶ 5} The issues remaining to be tried to the court included the amount and duration of spousal support for Teresa if the trial court found it was necessary; ownership of farm equipment owned by both Kraft Farms and Michael's father, Herman Kraft, as well as the remaining debt associated with the equipment; and Michael and Teresa's ownership interests in the property located at 8229 Old Dayton Road and the debt associated with the property. Both parties were represented by counsel throughout the pendency of the divorce and subsequent trial. At the close of the trial, the court ordered both parties to submit post-trial memoranda. On August 29, 2013, the trial court issued a decision allocating debt and distributing marital assets to both parties. A Final Judgment and Decree of Divorce was filed on October 8, 2013, which incorporated the terms set forth in the trial court's decision issued on August 29, 2013.

{¶ 6} It is from this judgment that Michael appeals and Teresa cross-appeals.

{¶ 7} For purposes of clarity, we will address the merits of Teresa's cross-appeal before we reach Michael's appeal. Teresa's first cross-assignment of error is as follows:

{¶ 8} "THE COURT ERRED BY LIMITING PLAINTIFF'S SPOUSAL SUPPORT TO 100 MONTHS AND DETERMINING SUPPORT USING ONLY DEFENDANT'S PERRY TOWNSHIP POSITION AND SETTING SUPPORT AT $1,100 PER MONTH."

{¶ 9} In her first cross-assignment, Teresa contends that the trial court erred when it determined the amount and duration of Michael's spousal support obligation to be $1,100.00 for one-hundred months. Specifically, Teresa argues that the trial court erred by only taking into account Michael's salary from his employment by Perry Township in order to determine the

amount of his spousal support obligation. Teresa also argues that based on her myriad health problems and inability to work, the trial court erred by limiting the duration of her spousal support to one-hundred months. Finally, Teresa asserts that the trial court erred when it imputed an annual salary of minimum wage to her when computing Michael's spousal support obligation. Based on the evidence she adduced at trial, Teresa believes that she is entitled to an increased spousal support award of indefinite duration.

{¶ 10} Domestic relations courts are vested with discretion concerning awards of spousal support, and their orders will not be disturbed on appeal absent an abuse of discretion. *Smith v. Smith,* 182 Ohio App.3d 375, 2009-Ohio-2326, 912 N.E.2d 1170, ¶ 77 (2d Dist.). As the Supreme Court of Ohio has determined:

> "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.
>
> A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

*AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 11} The purpose of spousal support is "for sustenance and support of the ... former

spouse." R.C. 3105.18(A). R.C. 3105.18(C)(1) provides:

> In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
>
> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
>
> (g) The standard of living of the parties established during the marriage;
>
> (h) The relative extent of education of the parties;
>
> (i) The relative assets and liabilities of the parties, including but not limited to any court ordered payments by the parties;
>
> (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional

degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 12} When reviewing an award of spousal support, we examine the record to determine whether the court considered each statutory factor which is relevant to the request, although the trial court need not have expressly commented or made a finding with respect to each such factor. *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 28 (2d Dist.); see *Kreilick v. Kreilick,* 161 Ohio App.3d 682, 2005-Ohio-3041, 831 N.E.2d 1046, at ¶24 (6th Dist.). In the present case, however, the trial court did expressly address the factors and made findings on nearly all of them before finding that a spousal support award was warranted. A number of the factors were not relevant: no minor children were involved; the parties have equal education; and both parties stipulated that Teresa was entitled to half of the marital portion of Michael's OPERS retirement account.

{¶ 13} As previously discussed, the parties were married on December 29, 1984. For the purposes of calculating the termination date of the parties' marriage, the trial court utilized

the first day of the trial, March 22, 2012, as the de facto termination date. Therefore, the trial court found that the parties' marriage lasted twenty-seven years and three months. The trial court also found that both Michael and Teresa were fifty years old as of the de facto termination date of the parties' marriage.

{¶ 14} Teresa argues that the trial court failed to take Michael's income from his farming business into account when it calculated his annual income. However, the trial court clearly utilized Michael's revenue stream when it calculated his average income. The trial court initially determined Michael's income from his superintendent position in Perry Township to be $39,368.00 in 2011. In order to determine the average revenue from Kraft Farms, the trial court examined the parties' tax returns for the years 2008, 2009, and 2010. Based on the information contained in the tax returns, the only year the farm turned a profit was in 2010 for $7,773.00. The trial court calculated Michael's annual income to be $47,171.00. The trial court reached this amount by adding one year of farm profit from 2010 ($7,773.00) to Michael's gross salary from 2011 ($39,368.00).

{¶ 15} At trial, Teresa testified that she transferred funds from the farm business account to the parties' personal bank account in 2008 and 2009. Therefore, she argues that those amounts that she transferred should be added to Michael's farming income for 2008 and 2009. The parties' joint tax returns, however, reflect that for the years 2008 and 2009, the farm operated at a significant loss. The parties' tax return for 2008 reflects a $98,000 loss attributable to the farm. Based on the parties' tax return in 2009, the farm operated at a $47,627.00 loss. Michael testified that the losses were so severe that he had to borrow money from the bank in both years to cover the farm expenses. In 2008, Michael borrowed approximately $69,000.00, and in 2009, he borrowed approximately $63,000.00.

{¶ 16}    While the evidence establishes that Teresa transferred money out of the farm account to the parties' joint personal account, it was still necessary for Michael to borrow money to cover the farm expenses for the years in question.  Moreover, the parties' joint tax returns from 2008 and 2009 establish that the farm operated at a loss.  The only year the farm realized a profit was in 2010 for $7,773.00, and the trial court added that entire amount to Michael's 2011 salary from Perry Township ($39,368.00) to reach the amount of $47,141.00, which the court utilized in part in order to calculate the spousal support award.  Thus, we conclude that the trial court's determination regarding Michael's annual income for the purpose of calculating his spousal support obligation is supported by competent and credible evidence.

{¶ 17}  For the majority of the marriage, the trial court found that Teresa was a homemaker while Michael was the "breadwinner" who paid for nearly all the household expenses.  Michael and Teresa both graduated from high school, but neither party sought any further educational opportunities.  Teresa testified that she last worked outside the home in 2004 on a part-time basis as a pet groomer.  Teresa further testified that she held her last full-time job prior to 2000 when she worked at a car dealership.

{¶ 18}  The trial court found that Teresa suffered from a number of health problems including "degenerative disks, diabetes, and a heart condition."  The trial court acknowledged that Teresa underwent several back surgeries and uses a walker.  Teresa testified that because of her medical condition, her medication costs total approximately $300.00 per month.

{¶ 19}  Teresa testified that she did not believe that she was able to work anymore "based upon [her] understanding of [her] medical condition."  The record established, however, that Teresa had not been determined to be disabled by the Social Security Administration (SSA) nor

any other governmental agency. Teresa also testified that she was ineligible for social security benefits. Teresa admitted on cross-examination, however, that she had never applied for any benefits from the SSA.

{¶ 20} It is apparent from the record that the trial court considered Teresa's health, by noting that she had back problems requiring invasive surgery, and other conditions such as diabetes and asthma. The trial court, however, was not required to credit Teresa's self-serving testimony that she was unable to work, nor did it have to give weight to her belief that she was totally disabled. See *Clemens v. Clemens*, 2d Dist. Greene No. 07-CA-73, 2008-Ohio-4730. "Credibility determinations are best left to the judgment of the trial court. * * * Trial courts, unlike reviewing courts, are in a position to view the witnesses and to assess their credibility in light of such nuances as the witness' body language and demeanor." *Merrick v. Merrick,* 2d Dist. Montgomery No. 15777, 1997 WL 216583, * 6 (May 2, 1997). Other than her own testimony, Teresa adduced no evidence that her health problems rendered her totally disabled and therefore unable to perform any job.

{¶ 21} Accordingly, we find that the trial court acted within its discretion by imputing a minimum wage to Teresa. R.C. 3105.18(C)(1)(b) requires the trial court to consider the "relative earning ability of the parties" when making a decision regarding support. "When considering the relative earning abilities of the parties in connection with an award of spousal support, Ohio courts do not restrict their inquiry to the amount of money actually earned, but may also hold a person accountable for the amount of money [that] a 'person could have earned if he made the effort.' " *Donese v. Donese*, 2d Dist. Greene No. 97-CA-70, 1998 WL 165012, * 3 (April 10, 1998), quoting *Miller v. Miller*, 2d Dist. Montgomery No. 14540, 1994 WL 730560,

*4 (December 28, 1994). During the parties' marriage, Teresa held various secretarial related positions. Testimony was also adduced that Teresa performed bookkeeping tasks for Michael and Kraft Farms well after she began having back surgery and her mobility became limited. While Teresa's physical ailments may negate her ability to perform labor intensive tasks, the trial court could have reasonably concluded that she was able to perform jobs where her lack of mobility would not be an impediment. Accordingly, we conclude that the trial court could reasonably impute a minimum wage income to Teresa for the purpose of calculating her spousal support award.

**{¶ 22}** Furthermore, while the parties in the present case had a lengthy marriage, that factor is not controlling. Recently, we stated the following in *Gore v. Gore*, 2d Dist. Greene No. 09-CA-64, 2010-Ohio-3906:

> The general rule is that where a payee spouse has the resources, ability, and potential to be self-supporting, spousal support should terminate within a reasonable time. See *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 68-69. But permanent support awards may be appropriate and reasonable in cases of long-term marriages, with parties of advanced ages, or to homemaker-spouses, spouses who have forgone the opportunity to develop meaningful employment outside the home to, for example, raise the parties' children. See id., paragraph one of the syllabus; see also *MacMurray v. Mayo*, Franklin App. No. 07AP-38, 2007-Ohio-6998, at ¶8. It is not uncommon for a court to award permanent spousal support in marriages that have lasted 19 years or longer. See *MacMurray*; see also *Parsons v. Parsons*, Franklin App. No. 07AP-541,

2008-Ohio-1904, at ¶16; *Leopold v. Leopold*, Washington App. No. 04CA-14, 2005-Ohio-214, at ¶3; *Russell v. Russell* (1984), 14 Ohio App.3d 408, 412. One court has said that "a marriage of long duration 'in and of itself would permit a trial court to award spousal support of indefinite duration without abusing its discretion or running afoul of the mandates of *Kunkle*.'" *Handschumaker v. Handschumaker*, Washington App. No. 08CA19, 2009-Ohio-2239, at ¶21, quoting *Vanke v. Vanke* (1994), 93 Ohio App.3d 373, 377. "Generally," the court continued, "marriages lasting over 20 years have been found to be sufficient to justify spousal support of indefinite duration." *Handschumaker*, at ¶21, citing *Hiscox v. Hiscox*, Columbiana App. No. 07CO7, 2008-Ohio-5209, at ¶47. See, also, *Bowen v. Bowen* (1999), 132 Ohio App.3d 616, 627; *Soley v. Soley* (1995), 101 Ohio App.3d 540, 550; *Vanke* at 376-77; *Taylor v. Taylor* (Aug. 4, 1998), Scioto App. No. 97CA2537; *Wolfe v. Wolfe* (July 30, 1998), Scioto App. No. 97CA2526.

*Id*. at ¶ 29. In *Gore*, we found that based on the parties' twenty-four year marriage, the wife's lack of current work history, and her need for additional vocational training, the trial court did not abuse its discretion by awarding spousal support to last for ten years. *Id*. at ¶ 28.

**{¶ 23}** In the instant case, we conclude that the trial court did not abuse its discretion by ordering spousal support for Teresa for one-hundred months. Importantly, we note that the trial court retained jurisdiction to modify the spousal support award in the event of a change in the circumstances of either party. The fact that the parties' marriage lasted over twenty-seven years does not require the trial court to order a spousal support award of indefinite duration.

{¶ 24} Upon review, we conclude that the trial court did not abuse its discretion when it awarded Teresa spousal support of $1,100 per month for one-hundred months. The trial court, pursuant to R.C. 3105.18(C)(1), reviewed all the relevant factors in determining the amount and duration of the award, and its decision in this regard is supported by competent and credible evidence.

{¶ 25} Teresa's first cross-assignment of error is overruled.

{¶ 26} Teresa's second and final cross-assignment of error is as follows:

{¶ 27} "THE COURT ERRED BY USING APPRAISAL VALUE OF 8229 OLD DAYTON ROAD BY DEFENDANT'S APPRAISER INSTEAD OF PLAINTIFF'S QUALIFIED APPRAISER."

{¶ 28} In her second cross-assignment, Teresa argues that the trial court erred when it used the report produced by Michael's land appraiser, Charles M. Stroh, to calculate the fair market value of the real estate located at 8229 Old Dayton Road. Teresa asserts that the evidence established that Stroh was not qualified to provide an appraisal value. Further, Teresa argues that the report of her appraiser, Rick L. Miller, should have been utilized to determine the fair market value of the property because he was specially qualified to appraise farm land, and his appraisal was, therefore, more accurate.

{¶ 29} " 'The trial court enjoys broad discretion in determining the value of a marital asset; however, this discretion is not limitless. Our task on appeal is not to require the adoption of any particular method of valuation, but to determine whether, based on all the relevant facts and circumstances, the court abused its discretion in arriving at a value.' " *Entingh v. Entingh*, 2d Dist. Montgomery No. 22117, 2008-Ohio-756, at ¶ 9, citing *James v. James*, 101 Ohio App.3d

668, 681, 656 N.E.2d 399 (2d Dist.1995).

{¶ 30}  A trial court errs and abuses its discretion if it "summarily arrives at a valuation of an asset or property, even though between the two extremes of the opposing parties' witnesses, without a proper evidential predicate." *Carter v. Carter*, 2d Dist. Clark No. 2008 CA 54, 2009-Ohio-3637, ¶ 17, citing *Rodriguez v. Rodriguez* 11th Dist. Geauga No. 89-G-1498, 1990 WL 47458 (Apr. 13, 1990).  Even though the trier of fact is granted much leeway in obtaining a value, it must do so based upon the evidence before it. *Id.*  Nevertheless, we will not disturb a trial court's valuation as long as the record contains sufficient evidence to support it.

{¶ 31}  Initially, we note that Teresa points out that her appraisal expert, Miller, is a state certified general real estate appraiser. R.C. 4763.01(K).  Accordingly, Miller is certified to appraise all types of property, including property zoned as agricultural in nature, as is the subject property. *Id.*  Conversely, Teresa asserts that Stroh was not qualified to appraise the subject property and was very limited in the types of property for which he could legally provide an appraisal.  Stroh testified that he holds certification as a state-certified residential real estate appraiser pursuant to R.C. 4763.01(L), which "means any person who satisfies the certification requirements only relating to the appraisal of one to four units of single-family residential real estate without regard to transaction value or complexity and who holds a current and valid certificate or renewal certificate ***."  Teresa argues that Stroh is only qualified to appraise real estate consisting of one to four units of residential single-family homes, and he cannot appraise land zoned as agricultural.

{¶ 32}  Stroh, however, testified that obtaining a certification from the State of Ohio establishes that the person is qualified to appraise in a specific area of real estate but does not

restrict the individual from appraising different types of properties. We note that R.C. 4763.13(F) states as follows:

Except as otherwise provided in section 4763.19 of the Revised Code,

nothing in this chapter shall preclude a person who is not licensed or certified

under this chapter from appraising real estate for compensation.

R.C. 4763.19(A) merely states that a person cannot perform a real estate appraisal for a mortgage loan unless that person is specifically licensed to do so under this section. Accordingly, we find that the trial court did not err when it found that Michael's appraiser, Stroh, was qualified to appraise the property. Moreover, we also note that Stroh testified that he had appraised over one-hundred agricultural farm properties and several dozen agricultural farm properties consisting of thirty-one acres or more. Therefore, the trial court did not err when it permitted Stroh to testify as an expert regarding his appraisal of the subject property.

**{¶ 33}** Teresa also complains that Stroh did not testify regarding the fair market value of the property when the parties were married. Miller testified that the property was worth $85,000.00 at the time that the parties were married in 1984. Evidence was adduced, however, that when Michael inherited the property from his aunt in 1981, it was valued at $90,000 for tax purposes. Thus, it was not error for the trial court to reject Miller's testimony regarding the fair market value of the property when the parties were married. It was well within the trial court's discretion to use the valuation of $90,000.00 for the subject property as a starting point for its calculations.

**{¶ 34}** After examining the property, Stroh valued it at $150,000.00. In order to perform his valuation, Miller split the property into two parcels of land, with one parcel

containing 31.64 acres of vacant agricultural land and one parcel consisting of 3 acres that contained the main house and outbuildings. Miller appraised the 31.64 acre parcel of agricultural land at $163,000.00. Miller appraised the remaining 3 acre parcel at $120,000.00. Thus, according to Miller the total fair market value of both parcels was $283,000.00.

{¶ 35} Stroh testified that as the land is currently zoned, it is not legally permissible to separate the property into two parcels as Miller had done. Miller testified that by dividing the property into two parcels, he created a "hypothetical condition." In violation of the Uniform Standards of Professional Appraisal Practice (USPAP), Miller did not disclose in his valuation report that he had presented the court with a hypothetical condition. Stroh testified that a hypothetical condition is a condition that is "contrary to what currently exists in reality." (Tr. 131, Lns. 19-20). On cross-examination, Miller testified that the property located in Trotwood, Ohio, is not currently divided into two separate parcels. Miller also testified that pursuant to Trotwood zoning laws, if a property is designated for Agricultural use, in order for it to be subdivided, each of the resulting subdivisions would have to consist of at least twenty acres. Miller, in fact, acknowledged that a zoning variance would be required to subdivide the property if the resulting divisions equaled less than twenty acres. Notably, Michael testified that once the divorce was final, he intended to keep living at and farming the land located 8229 Old Dayton Road. Michael further testified that he did not intend to ever attempt to petition for a variance and split the property into two parcels.

{¶ 36} In the instant case, the trial court did not abuse its discretion by valuing the property at $150,000.00. The trial court noted that although Miller and Stroh utilized some of the same comparable properties in arriving at the value of the property, Miller valued it "as if the

property could be subdivided and sold as two parcels while [Stroh] valued the property as one parcel." The trial court further found that the highest price of the property could be obtained if the land parcel could be subdivided. As previously stated, however, Miller's entire valuation hinged on the admittedly hypothetical condition that the City of Trotwood would grant a variance to subdivide the property. Both Stroh and Miller testified that they had no knowledge of Trotwood granting the type of variance necessary for Miller's appraisal to be credited. Michael testified that he had no intention of ever subdividing the property in the manner described by Miller. Thus, the trial court correctly found that it must "take the property as it is found[:]" to wit: one parcel of land consisting of tillable land, a single-family dwelling, and two outbuildings. Accordingly, we conclude that the trial court did not abuse its discretion when it utilized Stroh's appraisal of $150,000.00 as the best evidence regarding the fair market value of the property.

{¶ 37} Teresa's second and final cross-assignment of error is overruled.

{¶ 38} Michael's first assignment of error is as follows:

{¶ 39} "THE TRIAL COURT ERRED BY ORDERING THAT THE WIFE WAS ENTITLED TO ONE-HALF OF THE PROFIT FROM THE GRAIN STORED AT BRUBAKER'S ELEVATORS AS OF APRIL 10, 2013."

{¶ 40} In his first assignment, Michael contends that the trial court erred when it found that Teresa was entitled to one-half of the proceeds from the sale of the grain held in Brubaker's Elevators. Initially, Michael points out that the trial court ruled that the de facto termination date of the parties' marriage was March 12, 2012, the first day of the trial in the instant matter. The parties also stipulated that as of March 12, 2012, Michael was the sole owner and operator of Kraft Farms. Michael asserts the grain stored in the elevator was planted and harvested,

respectively, in the summer and fall of 2012, after March 12, 2012. Thus, Michael argues that because the grain was grown and harvested after the de facto termination date of the marriage, it is not marital property, and Teresa is not entitled to any of the proceeds from its sale.

{¶ 41} Regarding R.C. 3105.171(F), a trial court enjoys broad discretion when dividing marital property. *Heineman v. Manemann,* 2d Dist. Clark No. 2000 CA 76, 2001 WL 395687, *1 (April 20, 2001). R.C. 3105.171(F) provides: "In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

* * *

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public

pension;

(10) Any other factor that the court expressly finds to be relevant and equitable."

Since the court, pursuant to R.C. 3105.171(F)(2), must consider both the parties' assets and liabilities, "an equitable division of marital property necessarily implicates an equitable division of marital debt." *Buzard v. Buzard*, 2d Dist. Clark No. 2011 CA 18, 2012-Ohio-2658, ¶ 32, citing *Elliott v. Elliott*, 4th Dist. Ross No. 05CA2823, 2005-Ohio-5405, ¶ 16.

{¶ 42}  Michael testified on April 15, 2013, that he was storing approximately 5,000 bushels of soybean grain and 9,000 bushels of corn grain in Brubaker's elevator.  Michael testified that the stored grain was worth approximately $127,710.00.  Michael further testified that the entirety of the grain stored on April 15, 2013, was grain harvested from his 2012 crop. Michael testified that he plants his crop in the summer and subsequently harvests it the following fall.  The planting and subsequent harvesting in 2012, therefore, occurred *after* the trial court found that the marriage had terminated on March 12, 2012.

{¶ 43}  However, Michael testified repeatedly that he used farm proceeds from the previous year to finance the planting and harvesting of the following year's crops.  Therefore, regardless of when in 2012 Michael planted and harvested his crop, the record establishes that he financed his 2012 farm business with funds earned in 2011 when the parties were still married. Essentially, Michael invested marital funds in a venture that did not realize a profit until after the parties divorced.  Thus, because the record establishes that Michael used marital funds earned in 2011 to finance the farming in 2012, the trial court did not err when it found that Teresa was entitled to half of the profit ($127,710.00) realized from the sale of the grain stored in Brubaker's

elevator which was harvested in 2012.

{¶ 44} Michael's first assignment of error is overruled.

{¶ 45} Michael's second assignment of error is as follows:

{¶ 46} "THE TRIAL COURT ERRED IN AWARDING THE WIFE ONE-HALF [OF] THE APPRECIATION OF THE VALUE OF THE HUSBAND'S SEPARATE PROPERTY."

{¶ 47} In his second assignment, Michael contends that the trial court abused its discretion when it found that, although the parcel of land located at 8229 Old Dayton Road was his separate property, Teresa was entitled to one-half of the appreciation of the property while the parties were married. Specifically, Michael argues that any appreciation in the value of the property while the parties were married was passive. Thus, Michael asserts that Teresa is not entitled to one-half of the proceeds from the appreciation of the value of the property which occurred during the parties' marriage.

{¶ 48} "Any '[p]assive income and appreciation acquired from separate property by one spouse during the marriage' is likewise the separate property of that spouse. R.C. 3105.171(A)(6)(a)(iii). 'Passive income' means income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse. R.C. 3109.171(A)(4). Therefore, 'all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage' is marital property. R.C. 3105.171(A)(3)(a)(iii). That section 'unambiguously mandates that when either spouse makes a labor, money, or in-kind contribution that causes an increase in the value of separate property, that increase in value is deemed marital property.' " *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 400, 696 N.E.2d 575 (1998).

**{¶ 49}** In *Middendorf*, the issue before the court was whether, *after* property has been found to be separate, both parties must expend labor, money, or in-kind contributions before the appreciation in value is considered a marital asset. *Id*. at 399. Similar to the property in the instant case, the trial court in *Middendorf* found that a stockyard owned by a husband before marriage was his separate property. Based on testimony from a certified public accountant about the stockyard's value at the time of marriage and at the time of divorce, the trial court concluded that the stockyard had increased in value during marriage by $108,541. The trial court then awarded the wife one-half the increase in value. *Id*. at 398.

**{¶ 50}** On appeal, the husband claimed that before a trial court can decide that an increase in the value of separate property is marital, it must find that both spouses "expended significant funds or labor directly contributing to the increase or that the non-owning spouse must contribute substantial work to improvement and maintenance of the separate property." *Id*. at 399. However, the Ohio Supreme Court disagreed. The Supreme Court first commented that under the relevant statute, an increase in value is deemed marital property whenever "either spouse makes a labor, money, or in-kind contribution that *causes* an increase in value." *Id*. at 401, interpreting R.C. 3105.17(A)(3)(iii) (emphasis in original). The court distinguished this situation from passive appreciation, which remains separate property. *Id*.

**{¶ 51}** After reviewing the evidence, the Supreme Court found that the husband's efforts had contributed to the stockyard's appreciation in value during marriage. Accordingly, the court affirmed the finding that the appreciation was marital property, not separate property. *Id*. at 403.

**{¶ 52}** In the instant case, Michael testified that since a very early age, he has been involved in the business of farming the subject property. Michael further testified that he

utilizes skill and experience to select the correct seed and fertilizer. Michael engages in crop rotation, as well as other farming techniques that have increased the value of the tillable land and the harvest yields from the farm. We note that Teresa testified that when she was physically able to do so, she performed several tasks on the farm, including tending to the hogs and driving tractors.

{¶ 53} The trial court found that, like the husband in *Middendorf*, Michael's farming "is a marital asset." The trial court further found that Michael's continued farming of the property, coupled with his crop strategy and fertilizing regimen, helps to maintain the quality of the soil, "thus making said land more marketable to farmers."

{¶ 54} Upon review, we conclude that Michael's continued management and farming of the land directly contributed to its increase in value during the parties marriage. Accordingly, we agree with the trial court and find that any appreciation of the land's value during the parties' marriage was "active" and not "passive," and Teresa was therefore entitled to one-half of the marital portion of the increase in value of the property.

{¶ 55} We previously found that the trial court correctly determined that the property was worth $150,000.00 at the time of the parties' divorce, pursuant to Stroh's appraisal. The approximate increase in the value of the property during the marriage was $60,000.00. Because the property was valued at $90,000 at the time the parties married, Teresa is entitled to $30,000.00 as her marital portion of the appreciation of the property.

{¶ 56} Michael's second assignment of error is overruled.

{¶ 57} Because they are interrelated, Michael's third, fourth, and fifth assignments of error are as follows:

{¶ 58} "THE TRIAL COURT ERRED IN REQUIRING THE WIFE TO PAY ONLY 30% OF THE MORTGAGE BALANCE."

{¶ 59} "THE TRIAL COURT ERRED IN NOT EQUALLY DIVIDING THE DEBT DUE TO THE TRUST OF MARY GRIESHOP IN THE AMOUNT OF $7,160.00."

{¶ 60} "THE TRIAL COURT ERRED IN ORDERING THAT THE DEBT OF $8,655 DUE ON THE FARM EQUIPMENT BE THE SOLE RESPONSIBILITY OF MICHAEL AND HIS FATHER."

{¶ 61} In his final three assignments, Michael essentially argues that the trial court abused its discretion when it allocated certain undisputed marital debts to the parties. In his third assignment, Michael concedes that the trial court correctly found that the mortgage balance of $45,486.00 remaining on the property was a marital debt. Michael, however, argues that the trial court's decision to allocate seventy percent of the debt to him and only thirty percent to Teresa was an abuse of discretion. In his fourth assignment, Michael argues that the trial court erred when it found that the remaining $7,160.00 debt on a $40,000.00 loan from the trust of a deceased relative was the sole responsibility of Michael despite the fact that the court found that said debt was marital in nature. Finally, in his fifth assignment, Michael argues that the trial court abused its discretion when it found that the balance due of $8,655.00 on a combine and drill used for farming was the sole responsibility of Michael and his father who jointly owned the equipment. Michael asserts that his half of the balance due on the equipment in question was marital debt, and Teresa should be required to pay her portion of the debt.

{¶ 62} In *Arnett v. Arnett*, 2d Dist. Montgomery No. 20332, 2004-Ohio-5274, ¶ 8, we have stated the following:

Debts, like assets, are classified as property, and an order assigning them to one of the parties is a form of property division. Therefore, as with assets, "equality" is the "starting point" for dividing any debts which are marital. However, and as with assets, the court may divide the marital debt in some other fashion if it finds that an equal division would be inequitable. R.C. 3105.171(C)(1). (citations omitted).

Like the other issues we have considered, the standard of review is whether the trial court abused its discretion. *Easterling v. Easterling*, 2d Dist. Montgomery No. 18523, 2001 WL 369734, *5 (April 13, 2001).

{¶ 63} In *Mumma v. Mumma*, 2d Dist. Clark No. 99 CA 32, 2000 WL 299549 (March 24, 2000), we considered whether the trial court had abused its discretion by failing to equally divide debt on farm equipment. In this regard, we noted that:

R.C. § 3105.171(C)(1) requires equal division of marital property unless the court finds an equal division would be inequitable, in which case the court must divide the marital property equitably rather than equally. Steven claims that the court erred by failing to equally divide the debt on the farm equipment between him and Jill. He does not contend that the division of the debt as set forth by the trial court was inequitable, however. As noted above, the law does not require the court to divide marital debts and assets equally in all cases. Where an equal division is inequitable, the court must make an equitable division of the parties' debts and assets. As Steven has made no argument that the court's division of the farm equipment debt was inequitable, we find his claim meritless.

*Id.* at * 5.

{¶ 64}  Initially, we note that the parties do not dispute that the mortgage on the property, the balance remaining on the trust loan, and one-half of the balance remaining on the combine and the drill are all marital debt.  The trial court found that the parties took out mortgages on the property throughout their marriage.  The last mortgage the parties obtained was in 2005.  The trial court found that as of October of 2011, there was a balance of $45,486.00 remaining on the mortgage.  The trial court found it equitable to allocate seventy percent of the remaining balance on the mortgage to Michael due to his "demonstrated earning ability."  The remaining thirty percent of the mortgage debt was allocated to Teresa in light of her "physical limitations."

{¶ 65}  Patricia Kraft, Michael's aunt, testified that Michael asked her for a loan in the amount of $40,000.00 from his mother's trust in 2005 to assist with the farm and to cover costs incurred after being the victim of identity theft.  Teresa was present when Michael asked Patricia for the loan.  Patricia testified that no specific loan terms were discussed, and there is no documentation regarding the loan.  At the time of the parties' divorce, the balance remaining on the loan was $7,160.00.  The trial court found that allocating the entire remaining balance to Michael was "equitable in view of the totality of the distributions in this matter."

{¶ 66}  With respect to the balance of $8,655.00 remaining on the combine and the drill, the trial court simply stated that it found it "equitable that said debt shall be the sole debt of" Michael and his father.

{¶ 67}  Michael argues that the trial court should have allocated all of the marital debt equally.  Without providing any explanation, Michael contends that the trial court's decision regarding the allocation of the mortgage on the property, the balance remaining on the trust loan,

and one-half of the balance remaining on the combine and the drill are all marital debt was unequal and therefore, merely "inequitable."

{¶ 68} Upon review, we find that the trial court did not abuse its discretion when it allocated a greater percentage of the mortgage debt to Michael. Michael testified that he plans to remain on the property after the divorce and continue to farm the land as he has done in the past. Michael is the sole owner of the property and the sole proprietor of Kraft Farms. Moreover, Michael is employed by Perry Township and receives a regular salary. At the time of the divorce, Michael was fifty years old and in good health. Clearly, Michael has the ability and resources to provide for a comfortable life for himself, as well as shoulder more of the debt incurred by the parties during their marriage. While Teresa could potentially find employment, her earning capacity is limited by virtue of her health problems. Notably, the duration of Teresa's spousal support is not indefinite, and Teresa will have to secure a new residence.

{¶ 69} Our rationale with respect the trial court's allocation of the mortgage debt also applies to the debt owed to the trust and the remaining balance on the farm equipment. Stated simply, given the relative standing of each of the parties, it was not inequitable to allocate the lion's share of the marital debt to Michael. Thus, we conclude that competent and credible evidence was adduced at the trial court which established that the marital debt was distributed equitably amongst the parties, albeit not equally.

{¶ 70} Michael's third, fourth, and fifth assignments of error are overruled.

{¶ 71} All of Teresa's cross-assignments of error and Michael's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and FAIN, J. concur.

Copies mailed to:

Brian A. Sommers
Theresa A. Baker
Hon. Denise L. Cross